IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

DEPARTMENT OF CHILD SAFETY, S.P., *Appellants*,

*v.*

JUAN P., *Appellee*.

No. 1 CA-JV 18-0015
FILED 8-7-2018

---

Appeal from the Superior Court in Maricopa County
No.  JD 29446
The Honorable Sally Schneider Duncan, Judge

**VACATED AND REMANDED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellant, Department of Child Safety*

Maricopa County Public Advocate, Mesa
By David C. Lieb
*Counsel for Appellee*

---

**OPINION**

Presiding Judge Michael J. Brown delivered the opinion of the Court, in which Judge Maria Elena Cruz and Judge David D. Weinzweig joined.

---

**B R O W N**, Judge:

¶1 In this appeal we address whether the juvenile court erred in granting a motion for change of physical custody filed pursuant to Arizona Rule of Procedure for the Juvenile Court ("Rule") 59. Because no reasonable evidence supports the court's findings, we vacate the court's order and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 S.P. was born in 2011 in California. His biological father, Juan P. ("Father"), was convicted in 2005 of a felony involving possession of drugs for sale. Father served his jail sentence, but otherwise failed to complete probation. He was arrested in 2012 and deported to Mexico; he is not allowed to return to the United States because there is an active warrant for his arrest in California. When Father was deported in May 2012, S.P. went to live with him in Mexico but returned to the United States in May 2013 to visit his mother ("Mother"). The visit with Mother turned into an extended stay. Within a few months, Father lost contact with Mother and S.P. and for nearly two years made no efforts to find them, other than contacting S.P.'s maternal aunt and uncle once. In mid-2015, Father again sought to contact them after he learned S.P. was in the care of the Department of Child Safety ("DCS").

¶3 Meanwhile, S.P. had moved from California to Arizona with Mother. In November 2014, DCS took S.P. into care, alleging he was dependent as to Father because of neglect and dependent as to Mother because of neglect, substance abuse, and mental illness. DCS also alleged that Father was never married to Mother and he did not have a custody order or a child support order as to S.P. The juvenile court found that S.P. was dependent in February 2015 when both parents failed to appear, and due to their lack of participation, the court accelerated a permanency planning hearing and changed the case plan to severance and adoption. In August 2015, DCS filed a motion to terminate Father's parental rights based on abandonment. Father learned that S.P. was in DCS custody in Arizona in April 2015; however, he did not contact DCS until June and then once again in September.

¶4 In April 2016, Father filed a Rule 59 motion seeking the return of S.P. to his physical custody in Mexico. The juvenile court initially denied the motion, finding "there would be substantial risk of harm to [S.P.'s] mental or emotional health." At the same time, however, the court "thought DCS had not met its burden regarding the grounds of

abandonment" and thus ordered the parties to submit briefing on that issue before the next court date.

¶5        After briefing, but on the same factual record, the juvenile court reversed its prior ruling and ordered that S.P. be "immediately" returned to Father in Mexico. On appeal, we vacated the order that S.P. be returned to Father's physical custody, directing the court to hold a new evidentiary hearing on a Rule 59 motion or conduct a termination hearing before S.P. could be moved from Arizona to Mexico. *S.P. v. Juan P.*, 1 CA-JV 16-0446, 2017 WL 2125729, at *5, ¶ 20 (Ariz. App. May 16, 2017) (mem. decision). Before the mandate issued, and without holding an evidentiary hearing, the court entered orders dismissing the dependency case, finding that Father was a fit parent and, again, directing that S.P. be "immediately" returned to Father. DCS filed a petition for special action and motion for emergency stay. We granted the stay and the relief requested in the special action petition, concluding that the juvenile court lacked jurisdiction to dismiss the dependency case while the prior appeal regarding Rule 59 was still pending. *Dep't of Child Safety v. Duncan*, 1 CA-SA 17-0150, 2017 WL 2953353, at *2-3, ¶¶ 6, 13 (Ariz. App. July 11, 2017) (mem. decision).

¶6        In October 2017, the juvenile court held the evidentiary hearing on Father's second Rule 59 motion, as directed by this court. DCS opposed the motion, as did S.P.'s guardian ad litem and S.P.'s attorney. Following the three-day hearing, during which the court received testimony and reports from three experts, as well as testimony from Father, the DCS caseworker, the foster father, and S.P.'s therapist, the court granted Father's motion and ordered that DCS "immediately coordinate the return" of S.P. to Father in Mexico with the assistance of the Mexican Consulate no later than 24 hours after the filing of the order. DCS timely appealed and successfully sought a stay of the Rule 59 order from this court pending the outcome of this appeal.

**DISCUSSION**

¶7        Rule 59(E)(1) and Arizona Revised Statutes ("A.R.S.") section 8-861 provide that on request by a parent, the juvenile court shall return a child to the parent if it finds by a preponderance of the evidence "that return of the child would not create a substantial risk of harm to the child's physical, mental or emotional health or safety." The juvenile court has "substantial discretion when placing dependent children because [its] primary consideration in dependency cases is the best interest of the child." *Antonio P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 402, 404, ¶ 8 (App. 2008). We

review an order addressing the physical custody of a child for an abuse of discretion, *id.*, but we review legal issues de novo, *Dep't of Child Safety v. Beene*, 235 Ariz. 300, 304, ¶ 8 (App. 2014). We will not reweigh the evidence because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). Thus, we will accept the court's factual findings unless no reasonable evidence supports them. *Id.*

### A. Substantial Risk of Harm

¶8 DCS argues that no reasonable evidence supports the juvenile court's finding that sending S.P. to Mexico to live with Father would not create a substantial risk of harm to S.P.'s physical, mental or emotional health or safety. DCS further contends that the order is based on legally irrelevant and incorrect information, rather than reasonable evidence. Father counters, in part, that DCS waived its "reasonable evidence" argument because it failed to specifically urge that argument in the juvenile court. But Father does not cite, nor are we aware of, any authority suggesting a party challenging a court's ruling in a dependency proceeding waives the right to challenge on appeal the sufficiency of evidence supporting that ruling by failing to specifically address it in the juvenile court. And even assuming a party must do so, DCS complied when its counsel orally requested judgment in its favor immediately after Father rested his case.

¶9 In Father's closing argument filings on the motion, he asserted that because this case is "not typical" and neither Rule 59 nor A.R.S. § 8-861 explicitly establishes which party bears the burden of proof, it is DCS's burden to show that returning S.P. to Mexico would create a substantial risk of harm to his physical, mental or emotional health or safety. To the extent the juvenile court placed the burden on DCS, the court erred. DCS, as the non-moving party, is not required to prove the absence of such risk. Nothing in Rule 59 supports Father's suggestion that he does not carry the burden of proof. Therefore, as the moving party, and the one seeking to have S.P. returned to his care, Father bears the burden of establishing that S.P.'s return would not create a substantial risk of harm to his physical, mental or emotional health or safety. *See Palicka v. Ruth Fisher Sch. Dist. No. 90 of Maricopa Cty.*, 13 Ariz. App. 5, 9 (1970) ("It is the general rule that the party asserting the affirmative of an issue has the burden of proving it."); *cf.* A.R.S. § 25-408(G) (stating that when a court determines whether to allow a parent to relocate a child, the "burden of proving what

is in the child's best interests is on the parent who is seeking to relocate the child").

¶10      In its Rule 59 order, the juvenile court adopted the reasoning, facts, and law presented in Father's closing argument and his reply. In those filings, Father focused heavily on DCS's conduct and the harm it allegedly caused by failing to follow the court's orders in attempting to reunify S.P. with Father. Father argued DCS created S.P.'s situation by providing "bad information" to service providers and therefore "harm and suffering are unavoidable." The court added more analysis, reasoning in part that DCS "unduly emphasized" the bond between S.P. and his foster placement at the expense of Father's biological bond with S.P., and thus thwarted Father's efforts to reunify with S.P. The court also focused on Father being a "fit" parent, exceeding "the minimum parenting standards." The court therefore found, by a preponderance of the evidence, that there would be no substantial risk of harm to S.P.'s physical, mental or emotional health or safety if he is returned to Father.

¶11      Father argues that the opinion provided by Dr. Carlos Vega, a clinical psychologist, supports the juvenile court's decision. In his psychological evaluation with Dr. Vega, Father stated he felt the need and responsibility to do all he could to have S.P. back into his care. He explained that if he were allowed several visits with S.P., he would be able to realize if S.P.'s return would be injurious to S.P. Father acknowledged he speaks very little English and S.P. does not speak any Spanish, but explained that he has participated in parenting classes and counseling and feels that S.P. will adapt to life in Mexico with him once he is there and is given attention.

¶12      Dr. Vega testified that Father is "more than minimally adequately capable" of parenting S.P., and Dr. Vega had no safety concerns regarding a child in Father's care. According to Dr. Vega, Father loves S.P. and wants the best for him. Father testified, however, he would still want S.P. to be sent to Mexico to live with him even if a psychologist determined S.P. would be mentally harmed as a result. Moreover, Dr. Vega based his assessment of Father's parental fitness on the "unconditional love" that Father has for S.P. But Dr. Vega never evaluated S.P., and acknowledged he has no specific knowledge of any of the issues, either psychological, behavioral, or otherwise, that S.P. may have. Dr. Vega also testified that his assessment would be different if Father would still want S.P. returned to him even if a psychologist determined that S.P. would be mentally harmed. Upon further questioning, Dr. Vega stated he would have "grave concern[s]" and Father's psychological evaluation would have been "very different" if Father wanted S.P. returned to him immediately, regardless of

the psychological impact he may suffer. He added that his assessment of Father being "fit" would "[a]bsolutely" change if Father actually made such a statement.

¶13        As the juvenile court concluded, by all accounts, Father is a fit parent and is prepared to bring S.P. into his home in Mexico. He participated in a home study, he is currently parenting S.P.'s full and half-siblings, and he has adequate income to take on such responsibilities. Although he did not provide supporting documentation, Father explained that he located a school with an English tutor ready for S.P. and secured a therapist for S.P.

¶14        The juvenile court erred, however, to the extent it relied on Father being a "fit" parent because Rule 59's primary focus does not turn on parental fitness, but instead on whether there would be a substantial risk of harm to a child's physical, mental or emotional health or safety if a child is returned to his or her parent. *See* Ariz. R.P. Juv. Ct. 59(A), (E)(1); *Alexander M. v. Abrams*, 235 Ariz. 104, 107, ¶ 17 (2014) (recognizing that for disposition hearings, a court must "consider the health and safety of the children as its paramount concern," and specifically for reunification orders, the "court cannot determine that return to the parents is in the child's best interests if it has not . . . considered the child's health and safety and whether the child would be subject to a substantial risk of harm if returned") (quoting A.R.S. § 8-845(B)). Although a fit-parent determination may be a pertinent factor in a particular case, especially if the parent is unfit, such a finding does not lower the parent's burden of establishing that return of the child would not create a substantial risk of harm. Indeed, applying the rule in this manner is consistent with Dr. Vega's report, where he concluded that the "issue of reunification is not one of parental competency but rather it is . . . one that involves the best interest of the child, which is beyond the scope of this evaluation."

¶15        Additionally, compliance with a case plan does not equate to a finding that a child is not at risk of harm under Rule 59, as this court previously explained. *See S.P.*, 1 CA-JV 16-0446, at *4, ¶ 16. Rather, Rule 59 only requires that the court consider *noncompliance* with a case plan as evidence of a substantial risk of harm. *Id.*; Ariz. R.P. Juv. Ct. 59(D) ("The court shall consider the failure of the parent . . . to comply with the terms of the case plan as evidence that return of the child would create a substantial risk of harm to the child."). As noted in the closing argument submitted by S.P.'s counsel, Father's compliance with services does not establish "any greater or lesser likelihood that a child may be harmed if returned to a parent."

¶16 Based on the record before us, we are unable to conclude that reasonable evidence supports the court's Rule 59 order. While Father presented some evidence that returning S.P. to him would not create a substantial risk to S.P.'s physical safety, the record lacks any reasonable evidence showing that returning S.P. to Father would not create a substantial risk of harm to S.P.'s mental or emotional health or safety.

¶17 Dr. Amber LaMonte, a clinical psychologist, testified that given S.P.'s circumstances, it would be "traumatic" to move him at this point. Her opinion was based in part on her observation of S.P.'s recorded video conference visits with Father, where S.P. appeared very "withdrawn" and would not look up at the camera. Dr. LaMonte concluded that based on current circumstances, S.P. would suffer emotional or mental harm if placed with Father.

¶18 Dr. Elizabeth Capps-Conkle, a licensed psychologist and certified expert trauma professional who performed S.P.'s bonding and best interests evaluations, testified there is an "emotional risk" if S.P. were to be returned to Father in Mexico right now due to Father's lack of emotional attunement, and his expectations that S.P. would need to make all the adjustments rather than Father making some adjustments. In his interview with Dr. Capps-Conkle, S.P. stated he did not want to go to Mexico, and if he was ordered by the court to do so, he would tell his "Mom" (indicating his foster mother) and run away when he gets older. Based on S.P.'s behavior, Dr. Capps-Conkle concluded that S.P. does not want to seek a relationship with Father. She opined that there would be "an emotional risk to the child to be sent to Mexico to live with Father without Father making significant improvement in his ability to be emotionally responsive to the child."

¶19 Dr. Capps-Conkle further explained that she was concerned with Father's ability to be emotionally responsive to S.P. because Father feels he has done everything correctly and does not see problems with his interactions with S.P. She acknowledged that additional services, such as a therapist to help Father and S.P. better communicate, would have been appropriate. Finally, she testified that if Father still wanted S.P. to return to Mexico even if it was determined that moving him would cause risk of substantial harm, it would cause her concern because such a move could have "long-term effects of . . . depression, anxiety, mental health issue[s], [and] inability to function well academically."

¶20 Additionally, no evidence supports the juvenile court's decision to order the "immediate" return of S.P. to Father. In his April 2017

report, Dr. Vega explained that Father "wants what is best for his son" and that "the last thing he wants to do is psychologically injure his child." Given those comments, and Father's desire to see where things might stand after "several visits," *supra* ¶ 11, Dr. Vega noted that he "was left with the distinct impression that after 'six or seven visits' [Father] would likely relinquish his parental rights." And at the Rule 59 hearing, Dr. Vega testified that any transition S.P. makes would have to be "slow." He explained that he never meant to give the impression that a successful transition would be an immediate one, and that Father's psychological evaluation would be different if Father indicated he wanted S.P. back "tomorrow." Thus, the juvenile court's order for immediate return of S.P. goes beyond even what Dr. Vega suggested was appropriate to safeguard S.P.'s mental health.

## B.     DCS's Conduct

**¶21**     In further support of its order denying the Rule 59 motion, the juvenile court found that DCS promoted the foster placement's bond in an effort to advance the placement's interests in adopting S.P. while simultaneously subordinating Father's fundamental liberty interest in the care, custody, and management of his child. *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they . . . have lost temporary custody of their child to the State."). The court also criticized DCS for "comment[ing] in a disparaging manner" about Father living in Mexico and concluded that DCS, based on its "biases and prejudices," is advancing a position that it is in S.P.'s best interests to be raised in the United States over Mexico.

**¶22**     We take no position on DCS's alleged actions, comments, or motives as part of this appeal because Rule 59 focuses on the likelihood of a substantial risk of harm to S.P.'s physical, mental or emotional health or safety. To the extent DCS may have failed to comply with the juvenile court's orders or statutory obligations, in this case or in any case, the juvenile court may consider various options to ensure compliance. *See* Ariz. R.P. Juv. Ct. 59(E)(3), (6) (authorizing the juvenile court, when issuing findings and orders, to "[s]et additional hearings as required by law" and to "enter any other orders as may be appropriate or required by law"); *Alexander M.*, 235 Ariz. at 107, ¶ 15 ("[T]he juvenile court is obligated to oversee the dependency case, to consider the best interests of the child in every decision, and to 'independently review the decisions and recommendations of [DCS].'") (quoting *Maricopa Cty., Juv. Action No. JD-6236*, 178 Ariz. 449, 452 (App. 1994)). Stated differently, DCS's alleged

deficiencies in this dependency are not relevant to deciding whether Father met his burden under Rule 59.

### C.      Abandonment

**¶23**      Although there was no motion for termination pending in the juvenile court at the time of the Rule 59 hearing, the court nonetheless discussed the lack of evidence supporting DCS's abandonment theory. The court found that DCS "sought persistently and substantially" to restrict Father's access by failing to comply with court orders to put reunification services in place, including visits, Spanish language instruction, and appropriate therapy. The court then implicitly concluded that Father did not abandon S.P., analogizing this case to *Calvin B. v. Brittany B.*, 232 Ariz. 292, 293, ¶ 1 (App. 2013), where we held that "a parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child."

**¶24**      In doing so, the juvenile court failed to acknowledge our previous admonition that it erred in this case when it based its first Rule 59 order on the "perceived weakness of DCS's case for abandonment." *See S.P.*, 1 CA-JV 16-0446, at *4, ¶ 15. DCS's likelihood of success on an abandonment ground is immaterial for purposes of determining whether returning S.P. to Father in Mexico would create a substantial risk of harm to S.P.'s physical, mental or emotional health or safety. *See* Ariz. R.P. Juv. Ct. 59(E).

**¶25**      Finally, we recognize that in June 2017, the juvenile court dismissed the severance motion DCS had filed in August 2015. According to the record before us, DCS has not re-filed its motion for termination; however, it did object to changing the case plan to family reunification concurrent with severance and adoption. Father asserted in his closing argument that DCS never objected to the change of case plan, but our reading of the June 14, 2017, minute entry reflects that DCS did make an objection. Regardless, the issue before us is change of physical custody, not whether DCS can ultimately prove a statutory ground for severance.

**CONCLUSION**

**¶26** The record lacks reasonable evidence showing that the immediate return of S.P. to Mexico to live with Father would not cause a substantial risk of harm to S.P.'s mental or emotional health and safety. Father therefore failed to meet his burden of proof. Accordingly, we vacate the juvenile court's Rule 59 order and remand for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: AA